UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

LOCAL 827 INTERNATIONAL
BROTHERHOOD OF ELECTRICAL
WORKERS, AFL-CIO,

        Plaintiff,

    v.

VERIZON NEW JERSEY, INC.
and VERIZON NETWORK
INTEGRATION CORP., INC.

        Defendants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 02-5669 (JEI)

**OPINION**

**APPEARANCES:**

O'BRIEN, BELLAND & BUSHINSKY, LLC
BY: STEVEN J. BUSHINSKY, ESQ.
MARK E. BELLAND, ESQ.
The Executive Plaza
2111 New Road, Suite 101
Northfield, NJ 08225
    Counsel for Plaintiff

PITNEY, HARDIN, KIPP & SZUCH
BY: MARY B. ROGERS, ESQ.
P.O. Box 1945
Morristown, NJ 07962-1945
    Counsel for Defendants

JONES DAY
BY: THOMAS M. BECK, ESQ.
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2114
    Counsel for Defendants

**IRENAS**, Senior District Judge:

      Plaintiff, Local 827 International Brotherhood of Electrical

Workers ("IBEW" or the "Union") has filed a two-count Complaint against Defendants Verizon New Jersey, Inc. ("VNJ") and Verizon Network Integration Corp., Inc. ("VNI").  In its Complaint the Union has alleged that certain work performed by non-union outside contractors, specifically "NCR Customer Engineers" or "NCR CEs,"[1] is the same or substantially comparable to work that is currently or has historically been performed by Union employees, and thus the type of work that VNI is required by the parties' labor agreements to assign to Union employees.  The Complaint also alleges that Union employees were wrongfully denied certain wiring work.

The Court has federal question jurisdiction under 28 U.S.C. § 1331, as this matter arises under Section 301 of the Labor Management Relation Act, 29 U.S.C. § 185.[2]  We apply federal law and traditional rules of contract interpretation when they are not inconsistent with federal law.  *Teamsters Indus. Emp. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993).

---

[1] These CEs are employed by NCR Corporation, a New York Stock Exchange company. Originally, this company made cash registers (National Cash Register), but has transformed itself over the last century into a company that provides a wide variety of products and services, including the maintenance of complex data transmission networks.

[2] Although the instant dispute revolves around the interpretation or application of ancillary labor agreements, and not the collective bargaining agreement itself, our jurisdiction under Section 301 is not affected. *See, e.g.*, *Smith v. DCA Food Industries*, *Inc.*, 269 F. Supp. 863, 868-69 (D. Md. 1967) (allowing union employees to bring an action under Section 301 for a claim of breach of contract relating to pension fund agreements ancillary to the collective bargaining agreement).

Presently before this Court is a Motion for Summary Judgment by the Defendants.[3]  Because the factual record developed by the parties on this motion would not permit a finder of fact to conclude that the work performed by the NCR CEs was the same or comparable to the work currently or historically performed by Union members, summary judgment will be granted.

I.

A.

The Union is a labor organization representing certain classifications of employees of Defendant VNJ, an operating telephone company ("OTC") that is the successor to Bell Atlantic New Jersey, Inc.  (Compl. ¶5.)  VNJ provides telephone and data transmission services in New Jersey.  VNI provides software configuration, installation, monitoring and maintenance services on private wide area data networks ("WANs") to large commercial customers, such as banks, schools, power companies and hospitals. (Stmt. Of Facts, ¶1.)  VNI will use VNJ employees for certain work.  Both VNJ and VNI are wholly owned subsidiaries of Verizon Communications ("Verizon").

During the Bell Atlantic-GTE merger in 1998, a number of

_____

[3] In June, 2004, Defendants submitted a Motion for Summary Judgment, and Oral Argument was heard on July 23, 2004.  The Court denied summary judgment at that time, noting that the record was not yet fully developed. Defendants renewed their Motion for Summary Judgment on May 20, 2005, including new evidence from the additional discovery.  Oral Argument on the renewed motion was held on August 9, 2005.

agreements were drawn up to resolve work classification issues.[4]
These agreements designated which work would be performed by the
employees belonging to the various bargaining units attached to
Verizon.   Verizon bargained with the Communications Workers of
America, and both agreed upon a Customer Bid Work Agreement
("CBWA") and a Memorandum of Agreement ("MOA") which were
subsequently adopted by Plaintiff.

    Both agreements serve as the foundation for Plaintiff's
claims.   The CBWA states that:

> For the part of the Work which is currently or has been
> historically performed by IBEW bargaining unit
> employees, Verizon Network Integration Corp., Inc.,
> VNICI, shall utilize Verizon New Jersey, Inc. as its
> sole contractor and its IBEW [Union] represented
> employees shall perform the work.

(CBWA, ¶ 2.) The MOA also provides that Union employees should be
utilized to perform work for VNI that "is currently, has been
historically, or is substantially comparable to work performed by
IBEW bargaining unit employees. . . ."   (MOA, ¶ 3.)   The MOA's
Interpretative Comments explain that: "Work will be considered
'historically performed' by IBEW-represented employees if it has
been performed by such employees within the last seven years and
over a significant period of time."   (MOA Interpretative
Comments, ¶ 1.)   In addition, "current" work is defined as
including any "evolution of work."   (*Id.* at ¶ 2)

---

[4] These agreements were originally entered into in 1998, but were later
re-affirmed in 2000.

4

The Union contends that it is entitled to perform "maintenance" or repair work on customers' data networks.  This work, according to the Union, is being sub-contracted out to NCR CEs in violation of the agreements.  The Union asserts that NCR CEs do work that historically was performed by Union employees, and/or is work that evolved from past Union work.  The Union also argues that its members, belonging to three classifications of employees, System Technician - Operations, System Technician - OCS, and Network Technician, currently do comparable work.  Many of Plaintiff's arguments are based on the Union's work with three types of data transmission equipment - the CSU/DSU, the MUX, and the Fast Packet Switch.[5]

Defendants contend that the disputed work is complex software-based work.  According to Defendants, only high level management employees, not Union employees, historically have worked and currently work on modifying, configuring and repairing the complex software which is at the heart of most networks.  Defendants assert that only upper management type work has been

---

[5] The CSU/DSU is a piece of equipment that can be used as a branching point for connections.  To some degree, it is a "dumb" machine, because it does not have internal software.

The MUX or "multiplexor" was developed to assist in data transmission when there are many circuits going from one location to another.  It will basically compress the many circuits into one large circuit for the purpose of transportation. The process of decompressing the circuits is known as deMUX'ing or demultiplexing.  (McNally Dep., at 43-44.)

A switch can be involved in a multitude of tasks, depending on the type. It can supply a dial tone, a telephone number, or modern phone features, like call waiting and caller id.  In addition, it can be involved in the routing of the call; a local call is identified by the switch and routed through itself, while a long distance call will be routed to another line or carrier. (McNally Dep., at 29-30.)

contracted to NCR CEs.

The Union also seeks an injunction and unspecified damages for wiring work it claims that it is entitled to perform.  The work refers to the wiring for data and voice networks throughout buildings.  According to the Union, Defendants bid and contracted this work out, in violation of the applicable labor agreements. Defendants assert that March, 2003, marked the last time that they bid for wiring work and contend that there are no plans to bid for wiring work in the future.

## II.

The test for summary judgment is stated in Rule 56 of the Federal Rules.  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there

6

is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but. . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (citation omitted).

III.

A.

VNI offers its customers services related to the design and installation of data networks tailored to a customer's specific needs.  (Boyce Decl., ¶ 6.)  It is undisputed that the physical installation and initial set-up (referred to as the "rack & stack") of the network equipment is performed by Union members. (Stmt. Of Facts at ¶ 8.)

For example, System Technicians - Operations are involved in the rack and stack of routers and the installation of circuits with respect to the Verizon customer network equipment.[6]  System

---

[6] Brad Burke, a Systems Technician - Operations, described the rack and stack work as: "We actually take the router out, we put brackets onto the side, we mount it in a rack, we power the router up, we connect it to the WAN and we connect it to the customer's hub and then we check the lights to see if the router is functioning properly."  (Burke Dep., at 57.)  When an Operations Technician installs a router in a customer premise, he does not "configure" the router.  (Mascari Dep., at 116.)
A Systems Technician- Operations also works on circuits, the lines that create connectivity, for commercial customers.  (Pratt Decl., at ¶ 6.)  The Operations Technician will physically lay down the wire or cable, and may also deal with problems that arise with the circuit.  (Pratt Decl., at ¶ 10.)

Technicians - OCS[7] do similar work as the System Technicians - Operations, however, OCS Technicians deal primarily with internal Verizon equipment.[8]  The third category of Union employees, Network Technicians, "physically make sure the new equipment is set up properly."[9]  (Walsh Dep., at 10.)  They may also be involved in the monitoring of network devices, such as switches, and the physical replacement of hardware components after the initial rack and stack work is complete.

B.

Verizon's work for the customer does not end after a network has been designed and installed.  VNI's Provisioning Engineers handle testing, turn-up and customer acceptance.  Provisioning Engineers are high level management employees.[10]  According to Susanne Boyce, a Technical Manager at VNI, the Provisioning

_____

[7] "OCS" refers to the Official Company Services group.

[8] OCS Technicians work on Verizon switches - they "set them up, put the various cards in, make all the connections, and when you fire them up, software is downloaded remotely."  (Mascari Dep., at 30.)  In addition, OCS Technicians may do hardware maintenance on the Verizon equipment. (*Id.* at 15-16.)

[9] Network Technicians are divided into three sub-classifications.  Defendants characterize the three groups as: those who work in Central Offices and maintain cables and network devices, such as MUXs, those who work primarily with network creation, which includes assisting with physical installation and testing of new devices being installed on the public network, and those who sit in the centers and monitor "fast-packet switches."  (Travers Decl., at ¶ 5.)

[10] Provisioning Engineers are employed by VNI.  Technically, VNI does not employ any Union members, but utilizes Union members who are employees of VNJ.

Engineers are highly trained, with upper level certifications from Cisco, a major provider of equipment in the field. (Boyce Decl., at ¶ 7.)

Once the network is up and running, another group of management-level engineers, working in VNI's Technical Assistance Center ("TAC"), are responsible for the overall management of the network. There are two levels of support provided by the TAC - maintenance and management. Under maintenance, VNI responds to calls from customers with problems, but does not offer continuous monitoring of the customer's network. Under the management plan, VNI provides around the clock remote monitoring of the customer's network equipment. (*Id.* at ¶¶ 11-12.) If a customer in the management plan has a problem, or "trouble," an alarm will sound at VNI's Network Operations Center ("NOC") in Frazer, PA.[11] (*Id.* at 13.)

The NOC is also staffed by VNI management-level employees. These engineers have remote access to the customer's software, and can fix most problems from the NOC. Indeed, according to Defendants, 95% of troubles are software problems and "an equal percentage of problems can be repaired remotely." (Boyce Decl., ¶ 13.) Boyce testified that the dispatch rate is decreasing,

---

[11] Susanne Boyce, a manager at VNI, testified that "[i]f it's a maintenance customer the remote access will usually be through a modem and the TAC engineer will actually dial into the piece of equipment and gain access to it. . . . In the manage [sic] world, we have access that is actually dedicated to that customer's network and all of that information is sent back to us. . . ." (Boyce Dep., at 63.)

because with technology changes, the TAC can do more remotely to diagnose and repair problems. (Boyce Dep., at 65.)

### C.

In the five percent of cases that the trouble cannot be addressed remotely, VNI will contact its contractor, NCR, which will in turn dispatch a Customer Engineer ("CE") to fix the problem on site.[12]  (*Id.* at 16.)  The NCR CE will arrive at the customer site within hours.  (Boyce Decl., at ¶ 5; Napoli Decl., at ¶ 5.)  The outsourcing of this work by VNI to NCR is the issue in the present litigation.

The NCR CE is provided only with a general description or a "best guess" of the problem by the NOC engineers. (Boyce Decl., at ¶ 16; Napoli Decl., ¶ 4.)  Therefore, the NCR CE must engage in a process called "trouble shooting."[13]  This process can take any length of time, up to days, depending on the nature of the trouble.  One diagnostic tool which the NCR CE will sometimes employ is a device called the "sniffer."  (Napoli Decl., ¶ 9.)  A

---

[12] There are approximately eleven NCR CEs who have the level of training needed to be dispatched for a VNI trouble call in New Jersey.  (Battleson Decl., at ¶ 9.)  Based on the relatively few jobs that NCR CEs perform in New Jersey (any Pennsylvania work would not be covered by the relevant labor agreements in this matter), Defendants suggested during Oral Argument that the true purpose of this lawsuit is not for Union members to perform NCR CE work, but rather to alter the union-management demarcation at Verizon.  The Court declines to speculate on the Union's motivations and long term goals, and this Opinion does not rely on Defendants' conjecture.

[13] Trouble shooting refers to the process by which the technician or engineer will diagnose a problem.  It can be done on both hardware and software, but the techniques would vary.

sniffer helps capture the actual data running through the system.
The engineer is then able to read and analyze the data stream to
determine the problem.  There are no set instructions or
procedures given to NCR CEs to assist them in trouble shooting
and repairs.  (Napoli Decl., ¶ 8.)

Once the nature of the problem is determined, the NCR CE
will initiate the repair process.  This process often requires
the NCR CE to make repairs while the network is still live.[14]
Almost every time the trouble is software-based. (Napoli Decl.,
at ¶ 6.)  Napoli described that on the "infrequent occasions"
where the trouble is hardware-based, he still uses his software
skills to isolate the problem and to ensure that the network was
operating properly after the hardware was replaced.  (Napoli
Decl., at ¶ 6.)  If the trouble is only hardware-based and a
piece of hardware is replaced, new configurations are still
required, because replacement hardware is not generally sent out
"pre-configured."  (*Id.* at ¶ 7.)

The vast majority of the work that an NCR CE does is on
ethernet switches and routers, as these are the key devices in a
data network.  To configure a router, the engineer must have
advanced software skills.  For example, the engineer will
retrieve the information from the old router, and install it on

---

[14] Working on a live network is different than performing an upgrade or
making an installation on a down network.  The potential damage to the network
is greater when it is live.

11

the new router using a specific computer language, designed for file transfers.  Companies, such as Cisco and Nortel, which supply routers, provide certification courses in these software skills.[15]

D.

On occasions unrelated to the dispatch of NCR CEs, Union members may be called upon to perform routine maintenance on Verizon or customer equipment.[16]

For example, a System Technician - Operations can physically repair equipment related to the circuits (the wire or cable running to the customer's premise), by replacing a card or a power cord.  (Pratt Decl., at ¶ 11.)  In addition, the System Technician-Operations may also perform some maintenance functions on CSU/DSUs and MUXs.  (*Id*. at ¶ 13, 14.)  With regard to the CSU/DSU, the Operations Technician will set options from a pre-

---

[15] The training history and work experience of NCR CE's is set forth in the Declaration of Steve Battleson, a field services regional director for NCR.  NCR has its own training center in Dayton, Ohio, where it provides training for all CEs. (Battleson Decl., at ¶ 5).  In addition, CEs are sent to vendor provided courses. (*Id*.)  NCR is considered a "Cisco Gold Partner," which indicates that many of the CE's have the highest level of Cisco certification and training, and are given direct access to several proprietary Cisco web sites, allowing the CEs to download and use software which normally would be unavailable.  (*Id*. at ¶ 6.) The NCR CEs dispatched to VNI calls are at least a "Level II" engineer, under NCR's three-level ranking system, and have at least a decade of experience and Cisco certifications.  (*Id*. at ¶ 9.)
   Verizon employee Mr. Demetrio asserted that NCR CEs operate for Verizon at a level comparable to the work of a Level 5 or 6 Verizon manager.  (Demetrio Decl., at ¶ 10.)

[16] Union employee, Jay Mascari, an OSC Technician, testified that he *thought* Operations Technicians, also Union employees, in New York *might* do programming in addition to the work described herein.  His testimony on this point is pure, unsubstantiated conjecture to which the Court gives no weight.

12

set menu, while if the CSU/DSU malfunctions, it is completely replaced.  (*Id*. at 13.)

Brad Burke, a Systems Technician - Operations, stated that MUX maintenance work was like the Union technician's maintenance work on ZyXel routers, namely observing the equipment, checking connections, options, and alarms, and doing performance monitoring.[17]  (Burke Dep., at 59.)  Richard Pratt, a manager of Operations Technicians, stated that in addressing a malfunctioning MUX, Operations Technicians will examine the MUX's settings, and then remove and replace the cards that hold the software until the problem is isolated.  (Pratt Decl., at 15.)

Similarly, an OCS Technician may be called upon to perform routine maintenance on Verizon equipment.  Jay Mascari, a Union witness, testified that OCS Technicians could perform trouble shooting and testing on Verizon hardware, but not software.[18]

---

[17] Burke testified that Operation Technicians maintain and repair the ZyXEL router, a specific type of router used for Verizon information speed DSL.  (*Id*. at 21, 58-59, 75.)  By "maintaining" he meant going to the router and checking connections and configurations.  He personally did not perform any repair functions on routers, including the replacement of a defective router.  (*Id*. at 48-49, 76.)  He personally has not dealt with the ZyXEL router "yet" and does not repair Cisco routers.  (*Id*. at 75-76.) Nothing in Burke's deposition suggests (i) that the work done by union technicians on non-Cisco routers, or in racking and stacking Cisco routers, is remotely comparable to the work performed by NCR CEs or (ii) that the software which runs a Cisco router is in any way comparable to that of the routers referred to by Burke. Attaching the word "router" to a particular piece of equipment or "software" to a particular program, even accurately, is not helpful in dealing with the issues in this case which revolve primarily around the repair and maintenance of software on ethernet switches and Cisco routers.

[18] Mascari clarified that trouble shooting could mean looking at a power supply board, checking the connections, unplugging and plugging other equipment, checking the voltages and fuses, and making sure all the lights are on.  (Mascari Dep., at 20.)

(Mascari Dep., at 18, 20, 52-53.)  For example, an OCS Technician may "test" a router by conducting a "PING" test.[19]  As for repairs on routers and servers, OCS Technicians will replace[20] malfunctioning cards in routers and replace defective hard drives in servers that are still under the manufacturer's warranty. (*Id.* at 67-68.)  Other routine maintenance for OCS Technicians includes changing surge masters and power cords, if they begin to smoke, and attending to the hardware in switches. (Mascari Dep., at 28, 30, 38-40.)

Network Technicians also are involved to some degree with work that could be superficially classified as repair or maintenance work.  One sub-group of Network Technicians remotely monitors "fast packet switches" and does certain repair operations.  A Network Technician will be alerted when there is a problem with one of the switches; he then is directed by a detailed flow chart, which outlines the steps necessary to remotely work through the problem.  (McNally Dep., at 29; Travers Decl., at ¶ 10-12.) If the problem cannot be addressed through the set procedures, the Network Technician passes the information along to a non-union, management-level supervisor.  (Travers

---

[19]  The PING test is inserted from a workstation or a PC.  At the MS-DOS prompt, the technician types "PING" and an IP address.  Through this test, the technician can see if the information is getting out. (*Id.* at 45.)

[20]  Mascari testified about the physical act of removing one card and putting in a new one. He noted that OCS Technicians will look for obvious connection problems, but would not trouble shoot router software.  (Id. at 67-68.)

14

Decl., at ¶ 13.)

Network Technicians who belong to the switch or toll sub-group may change defective cards and work on MUXs.  The bulk of any work on MUXs is guided by Detailed Level Procedure ("DLPs").[21] (Walsh Dep., at 25.)  Network Technicians may provide assistance during switch upgrades,[22] and do "optioning," which is required when the wrong option from a drop down menu is selected and needs to be changed.  (McNally Dep., at 32-33.)  For example, if the switch is not communicating with another piece of equipment, it may be because the wrong selection was highlighted on a drop-down menu, so the Network Technician will either change the option on the terminal or manually remove a piece of hardware and replace it (presumably resetting the system).  (McNally Dep., at 69-71.)

The deposition testimony of Walsh made clear that in any of their maintenance duties, Network Technicians do not program or configure switches, do not configure routers, do not work on malfunctioning software, and do not use a sniffer to trouble shoot.  (Walsh Dep., at 46, 49, 51-52.)

---

[21]  Michael Walsh, a Network Technician, testified that he has never actually worked on any MUX software.  (Walsh Dep., at 43.)  He did, however, change software remotely from his office.  To do so, he would "work off a sheet of paper to tell me how to do it. Cold, I wouldn't know how to do it." (*Id.* at 27.)

[22]  Walsh described this work as "babysitting. . .in case the switch crapped out."  (Walsh Dep., at 49.)

IV.

A.

Distinguishing between the meaning and intent of a contract on the one hand, and application of the contract to a particular set of historical facts on the other, is not without difficulty. In the first instance we ask whether the words of the contract are ambiguous, whether the contract might be susceptible to more than one interpretation.  In the later we consider the legal consequences flowing from a contract, after its meaning and intent has been determined, in light of the facts surrounding its execution and implementation by the parties. Since we hold that the CBWA and the MOA are not ambiguous, it is to the latter task we turn.

In determining whether an agreement is ambiguous, "we do not simply determine whether from our point of view, the language is clear." *Teamsters Indus. Emp. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993).  Instead, we "hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings." *Sheet Metal Workers, Local 19 v. 2300 Group, Inc.*, 949 F.2d 1274, 1284 (3d Cir. 1991) (quoting *Mellon Bank, N.A. v. Aetna Business Credit Inc.,* 619 F.2d 1001, 1011 (3d Cir. 1980)).  Our determination is based on "the contract language, the meanings

16

suggested by counsel, and the extrinsic evidence offered in support of each interpretation." *Teamsters Indus. Emp. Welfare Fund*, 989 F.2d at 135. "[A] text unambiguous when accorded the commonly understood meaning of its words cannot be disregarded unless the extrinsic evidence is such as might cause a reasonable fact finder to understand the text differently." *American Cyanamid Company v. Fermenta Animal Health Company*, 54 F.3d 177, 180-83 (3d Cir. 1995).

In this case the only possible ambiguity in the CBWA and the MOA might arise from a dispute over the meaning of the word "work" or the meaning of the phrase "evolution of work." In our view neither "work" nor "evolution of work" is ambiguous. The "work" of an employee or particular group of employees relates to the daily tasks assigned by the employer. While occasions may arise for an employee's daily tasks to vary, his "work" will remain the core functions he continually or repeatedly performs on a regular basis. This construction is supported by language of the MOA which defines work as being "historically performed" not only in terms of time frame ("within the last seven years"), but also in terms of regularity ("over a significant period of time").

Nor do we find evolution of work to be ambiguous. As technology advances, the way an employee performs particular tasks will almost invariably change - i.e., there will be an

evolution of work.  Surely the Union's work involved in installing equipment and devices which are used in the transmission of data has changed since 1991.

The dispute in this case does not really involve a dispute as to the meaning of the CWBA or MOA, but is rather a dispute as how to apply those terms to the facts which grow out of the relationship between the parties during the relevant time period. If a written contract is unambiguous "[i]t is the role of the court to interpret" it.  *Sheet Metal Workers, Local 19,* 949 F.2d at 1284.

Even were we to find ambiguity in the word "work" or the term "evolution of work," neither party offers any evidence from which a trier of fact might determine that meanings other than those used the Court were intended by the parties in 1998.  *Cf. Teamsters Industrial Employees Welfare Fund*, 989 F.2d at 137.  It will be the Court's task, however, to determine whether based on the record before the Court on this Summary Judgment motion, and viewing the evidence in a light most favorable to the Plaintiff, a finder of fact could determine that Defendants had breached the CBWA or the MOA by allowing the NCR CE's to do certain work at VNI's customers' places of business.

B.

Work currently contracted to NCR almost always involves

18

diagnosing and repairing a malfunction in the complex software
used to run ethernet switches and Cisco routers and restoring
that software to functionality.  This work is generally done on
live networks, and even when hardware replacements are required
the NCR CEs still need software skills and experience.  (Napoli
Decl., at ¶ 8; Boyce Decl.)  Trouble shooting and repairs depend
on the NCR CE's individual discretion and independent analysis,
rather than their following instructions in a set protocol or a
drop down menu.  Work contracted to NCR is similar to that which
would be done also by upper level Verizon managers if it was
having similar problems with a network of its own.  In defending
this motion Plaintiff has not produced evidence upon which a
reasonable finder of fact could conclude that Union employees, in
the words of the CBWA, "currently" perform or have "historically"
performed the same or comparable work as NCR CEs.[23]

The testimony indicates that System Technicians - Operations
are not involved in software trouble shooting or configuration of
routers or switches.  While Burke stated in his deposition that
his work included "maintaining" routers, he later clarified that

---

[23] Defendants claim that the "comparable" language appears in the MOA
and not in the CBWA, and therefore should not be used as the standard.  We
reach the same conclusion regardless of whether we review the case under the
standards of the CBWA or the MOA.
    While the Court sees a legally significant difference between the work
of the Union members compared to the work of the NCR CEs, we in no way mean to
undervalue or demean the work of the Union employees.  It is very clear that
the Union members are skilled workers, performing jobs integral to the
efficient installation and operation of any Verizon internal network or a
network sold to a VNI customer.

by the term "maintaining," he meant physically checking the connections and the configuration, and did not mean trouble shooting or using his own independent analysis.  Indeed, Burke stated that in "maintaining" the routers, he does "just what we would get from the rack and stack."  (Burke Dep., at 58-59.) Furthermore, Burke could not recall the meanings and uses of many programming commands, and could not recall a time in his career where he did trouble shooting on a Cisco router. (Burke Dep., at 49-50.)

While System Technicians - Operations may work on MUXs and CSU/DSUs, less sophisticated equipment used in earlier networks, they have not, do not, and could not configure or trouble shoot ethernet switches or Cisco routers as the NCR CEs do.  Indeed, Burke testified that when he configured a router at the Asbury Park Board of Education, following his training class, he answered simple questions at the computer's prompts, and then the machine went into auto install.  Burke acknowledged that the answers to the prompted questions were probably given to him. This work is vastly different than the type of trouble shooting and problem solving done by NCR CEs when attempting to restore functionality to a customer's router, a task which requires years of software training and experience.

The work done by System Technicians - Operations on MUXs is limited to the physical replacement of pre-programmed cards.

Similarly, their work with CSU/DSU is limited to hardware based replacement of components, or the entire machine.

System Technicians - OCS also do not currently perform the same or comparable work.  Indeed, their work is comparable to that of the System Technicians - Operations.  Mascari repeatedly stated that his work focuses almost exclusively on hardware. OCS Technicians do trouble shooting, but do not "do too much software shooting [sic]."  They do not run software tests, and the only software they may handle is loading printers or drivers on a personal computer, software is download remotely on switches after technicians do their installation. (Mascari Dep., at 18, 30, 32, 52-53.)

While System Technicians - OCS may work with routers or servers, their focus is on their physical installation and monitoring.  They unplug and plug in equipment, check fuses, visually see that appropriate lights are on, replace router cards, remove defective pieces from servers, and check the power and the hard drive on servers.  They also may engage in a limited form of "testing" the equipment, utilizing the PING test, which does not require them to use independent judgment or analyze unique situations.

Like that of the System Technicians, the work of a Network Technician is predominately the physical monitoring and changing of hardware.  Walsh testified that "the technicians physically

make sure the new equipment is set up properly." (Walsh Dep., at 10.) By Walsh's own testimony, he has never "loaded" an operating system, he rarely goes to customer premises, does not configure switches, does not configure routers that are up and running, has never worked on router software that was malfunctioning (including never having to figure out what the malfunction was), never diagnosed whether a router was infected with a virus, and never used a "sniffer." (Walsh Dep., at 51-52.) Walsh testified that Network Technicians take part in upgrades on the switches, but later described that task as "babysitting" (Walsh Dep., at 49.)

Although certain Network Technicians provide support for fast packet switches and MUXs, this support does not amount to "comparable work." Fast packet switches are unlike an ethernet switch. They are far less complex, and the Union work on them is uniform in nature. Network Technicians do not actually "work on" or "repair" fast packet switches. Rather they monitor a management system that evaluates the switch system and reports problems. If a problem arises, a Network Technician will attempt to solve it using a detailed flow chart, but will turn the problem over to the management level if following the flow chart is insufficient to achieve a solution.

Robert McNally, a Union technician, conceded that when Network Technicians work on MUXs they follow a set procedure

22

embodied in a DLP. Servicing an MUX does not involve any software based work, and Walsh testified that he has never worked on the software of a MUX. (Walsh Dep., at 43.)  Although Plaintiff argues that the deposition testimony of Walsh and McNally imply that Network Technicians are involved in trouble shooting and software work, subsequent testimony makes clear that they were referring to the task of "optioning." (Walsh Dep., at 32-33; McNally Dep., at 69-71.)  As with the work on fast packet switches and MUXs, optioning follows set protocols, that do not rely on the technician's extensive training and experience to solve problems without a road map.

Plaintiff has failed to demonstrate that anything in the record would permit a finder of fact to conclude that work performed by NCR CEs was ever assigned to bargaining unit employees.  John Demetrio, a Verizon Technical Manager, testified that the initial configuration on routers and switches has always been done by non-union management employees.  (Demetrio Dep., at 53-57.)  Pratt also stated that to his knowledge, no Union member has ever configured or repaired a piece of software.  It is uncontested that the work being done by NCR CEs on customer networks is comparable to the work performed by Verizon's own high level management employees on its own networks.

The vague and non-specific testimony offered by Union members, that they knew of or had heard of a certain Union member

doing particular work, does not provide an evidentiary basis for concluding that the disputed work is currently, or was historically, the province of Plaintiff's members.  Indeed, Burke conceded that he never worked on a router prior to 2000, and could not recall if he even had ever replaced or repaired a router.

Burke testified that he "configured" a router for Asbury Park Board of Education after taking a training class, and trained others at his level on configuration.  Yet, Burke was unable to remember much of what he had done for Asbury Park Board of Education, and appeared to know very little about networks and the accompanying software.  (Burke Dep., at 9, 13-18.)  Testimony about one five year old incident, totally lacking in detail, involving two union employees who were participating in some form of educational program, hardly supports the proposition that the configuration of routers is currently or was historically Union work.[24]

C.

Plaintiff also argues that the work contracted to NCR is "current work" because, under the MOA, it represents evolution of

---

[24] Even if we assume that (i) on a few isolated occasions a particular Union employee performed a task also performed by a NCR CE, or (ii) a particular Union employee might have skills necessary (with or without additional training) to do some or all of work done by a NCR CE, this would be insufficient to create an issue of fact as to what the "work" of a Union member is or was. *See* discussion in Part IV.A., *supra*.

work that was historically performed by Union members. This argument is based on Plaintiff's contention (i) that routers and ethernet switches, like earlier generations of equipment, are still basically involved in the transmission of data, and (ii) that Union employees have always "maintained" everything they installed.

The Union's evolution of work argument is flawed because it fails to distinguish the concept of evolution of work from that of evolution of technology.  The evolution of technology can change the way an employee performs particular tasks - his or her "work."  New technology can also make certain work redundant or spawn entirely new work. The creation of new jobs ("work") that results from advances in technology in data transmission is not equivalent to the evolution of the work performed by a particular group of employees.

The trouble shooting and repair of software is new and different work from physically installing equipment used in the transmission of data. The work Plaintiff's members do in installing or physically maintaining newer generations of equipment may have "evolved" to require more sophisticated tools and additional skills, but working on, repairing and maintaining the complex software now necessary to the functioning of this new equipment is not somehow an evolution of the traditional rack and stack work.

An analogous situation is seen in the case of employees who created written materials.  Such work was once performed by scriveners who hand-wrote all documents. The quill pen was eventually replaced by the manual typewriter, then the electric typewriter, and now by a word processing program (software) which is installed on a personal computer often linked to a WAN or a LAN.

The appearance of typewriter repair persons was not an evolution of the work of a scrivener. Similarly, the appearance of employees who worked on and maintained the software of computers which run word processing programs, does not make that work an evolution of a typist's work.  An evolution of work resulted from the evolution of technology in the sense that employees charged with producing written work learned to operate the typewriter and then the computer word processing program to fulfill the basic functions of the job.  However, such employees would not undertake to fix a word processing program which became inoperable by reason of a software problem in the program or some sort of network failure.[25]

_____

[25] Forty years ago there were still a few court reporters who took notes with a pen on a steno pad. This evolved into taking notes on a typewriter-like apparatus which imprinted symbols on paper. Eventually, computer programs were developed which could translate the keystrokes to something which, hopefully, looks like English, creating what is now known as real time reporting. The reporter's "work" has certainly evolved as the technology has evolved. But if the software does not function or the machine will not write, the problem is placed back into the hands of personnel trained to handle this kind of software problem.

As the Industrial Revolution progressed, equipment used in the work place became more and more complicated.  Work evolved as employees learned to operate new equipment, although this technological advancement also created new jobs as specialists were needed to repair and maintain this equipment.  While the line between (i) upgrading skills to permit operation and routine maintenance of the new equipment by employees who traditionally worked with earlier generations of that equipment, and (ii) the new skill sets required to do significant repair and maintenance on that equipment may sometimes be murky, in this case the Plaintiff's members and NCR CEs each safely fall on opposite sides of the line.

In the last thirty or forty years, rapid technological advances in computer technology have revolutionized all aspects of commercial life.  As a result, the gap has widened between the maintenance and repair of devices or equipment, on the one hand, and their operation or physical installation, on the other.  As computer software has become the brains which make equipment and devices operable, the installation, repair and maintenance of that software requires a skill set far different and usually more complex than that needed to physically install or operate the equipment or devices themselves.  A machine tool operator might be trained to physically install and operate a computer-controlled lathe. It does not follow that such an operator could

27

configure the software program or properly diagnose a software problem if the lathe suddenly ceased to work.

As equipment has become more software-driven, Plaintiff's members surely have developed increased skill sets in performing, in a broad sense, their traditional rack and stack work.  It does not follow that diagnosing and repairing a software problem in that equipment is an evolution of their traditional work, even if the need for this service is a direct result of an evolution of technology.

D.

Plaintiff argues that Defendants' failure to provide adequate training has led to Union members losing or failing to stay up to date with requisite skills that they once had for router and switch work.[26]  This is really a variant of the evolution of work argument discussed in Part IV.C. above.

While there is little doubt that to the extent technological advances create a true "evolution of work," there probably is an obligation (or a practical need) for the employer to train its employees to perform the evolved tasks. Certainly a typist would

---

[26] Plaintiff also make a somewhat inconsistent argument that Union members have, in fact, received training on NCR CE type work which, according to the Union, is evidence that the work is comparable to or was historically done by Union members. The Court will not spend much time on this argument except to note that the training referred to in depositions and affidavits does not remotely approach the training required of a NCR CE or a Verizon management engineer doing similar work.

have to be trained to use a word processing program.  And as those programs became more sophisticated, further training would be required. It is highly doubtful that Plaintiff's members trained to perform rack and stack work as it was done in 1990 could do today's rack and stack work without additional training. It does not follow legally or logically that training is desirable or required to enable those employees to perform new and different work created by the march of technology.

McNally testified that Union members *could* become proficient in the work performed by NCR CEs, but it would take several years to complete the required education. There is simply no way to determine which Union members would have the desire and ability to undergo such training.  McNally's testimony militates against the Union's argument.  If particular tasks truly represent an evolution of traditional union work, common sense suggests that it should not take years for those employees to be educated to perform such tasks.  Plaintiff's argument implicitly gives credence to Defendants' position that those who work directly with software, particularly on "live" systems, diagnose problems, and make decisions under time pressure as to the best remedial course of action, are not performing tasks comparable to or an evolution of work traditionally performed by Plaintiff's members.

There is no doubt that some Union employees *could* handle such work if they too went to school and took specialized classes

for years.  Indeed, a number of bargaining unit members, like Lloyd Anderson, made the transition from the Union to management.[27]  However, the potential of some Union employees to enter management is neither evidence of evolution of work nor an indication of breach of the applicable labor agreements.

E.

Plaintiff argues that Defendants are motivated only by the finances - it would be too expensive to provide this work to bargaining unit members.[28]  The economic impact on Defendants were they to follow the course of action urged by Plaintiff is well beyond the scope of the issues before this Court.  The Court's ruling in this matter does not depend on the economic impact of its decision on any of the parties.

V.

On March 11, 2005, as per Judge Rosen's Order of February 22, 2005, Plaintiff produced its evidence on damages, which did not include any calculation for how a finder of fact could

---

[27] Lloyd Anderson moved from the Union position of a Systems Technician to a management level Systems Engineer, and then to a high level management position.  Anderson noted in his deposition that it took him "eight years to get competent to be able to work safely on switches and routers in our corporate network."  (Anderson Dep., at 51.)  By "safely," Anderson explained that he has never caused an "outage," which results in a site or a network being taken down.  (*Id.* at 52.)

[28] Defendants specifically argue that its policies regarding divisions of labor are not up for review in this matter.  (Defs Reply Brief, at p. 14.)

measure in monetary terms the damages for wiring work allegedly contracted out in violation of the applicable labor agreements. Furthermore, Plaintiff has not demonstrated that there are any remaining triable issues relating to the need for injunctive relief, as wiring work has not been contracted out in years.

VI.

The Court finds that the Plaintiff has not proffered sufficient evidence to enable a finder of fact to conclude that the work currently performed by NCR CEs is the same as, substantially comparable to, or an evolution of the work performed by Plaintiff's members (i) in 1998 when the CBWA and MOA were first signed, (ii) at any time from 1998 to the present or (iii) for the seven years prior to 1998.  Thus, Defendants are not in breach of any term of the CBWA or the MOA, nor have they breached any duty of good faith owed to the Plaintiff. The Court also finds a total absence of evidence proffered by Plaintiff as to losses sustained as a result of the alleged improper subcontracting of certain wiring work prior to March of 2003.

Based on the foregoing the Court will grant Defendants' Motion for Summary Judgment.  An appropriate Order will issue on even date herewith.


Date:   August 18, 2005

s/Joseph E. Irenas
**JOSEPH E. IRENAS, S.U.S.D.J.**